Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Welcome to the fourth and final day of the law in Franklin County, the number 16th. The court and our sheriff have dedicated themselves to carrying out our duties and assigning the cases that appeal to us as fairly, promptly, and efficiently. As the circumstances permit, that depends on the cooperation of the attorneys. We appreciate their understanding and cooperation in this new format. We've got three cases today. The first one up is United States v. Grow. We'll hear from the attorney, or the appellant, Mr. Grow, and let his attorney, David Marcus, spell what it says. Chief Judge Carnes, and may it please the court, my name is David Marcus. I will be speaking on behalf of Monty Grow. I'd like to address the following arguments this morning. First, that the evidence on the fraud counts was insufficient. Second, the sentence on count one was an error because the judge made no findings on the multi-object conspiracy at sentencing, which was required by binding case law. Third, the trial court interfered with jury deliberations, which was reversible error. And if I can get to it, number four, that the evidence was insufficient on the kickback counts. First, let me address the sufficiency of the evidence on counts one and five, the fraud counts. So to win these fraud counts at trial, the government had to show two things. First, that the prescriptions were not for a legitimate purpose. And second, that Monty Grow knew that the doctors were issuing prescriptions for a non-medical or non-legitimate purpose. And the government did not prove either of these elements. The government conceded to the district court, although it changes its fact on appeal, that it did not prove the prescriptions were illegitimate. For example, it said medical necessity was not an issue in the case, both at the Rule 29, after it closed, after the defense closed its case, in openings, and in closing arguments. And the reason that the government made such a concession is because it never called any expert witness. It only called one of the treating physicians. And that doctor said that all of his prescriptions that he signed were valid and legitimate. In fact, both the government and the trial court stated, at the Rule 29 argument, that it would not be possible to present the case against the doctors because they weren't... Let me stop you for a question. This is Judge Marcus. Was the government obliged to put upon an expert, or could they not rely on several of the witnesses who testified that they signed up, they got the money, not because they needed any of the products, like for scar cream or anything like that? Where is the obligation to call an expert found? So, Judge Marcus, there's no requirement of calling an expert, but there is a requirement of proving medical necessity, that the prescriptions were issued for a non-medical purpose. And so, all of this court's cases from Medina on have said kickbacks are not enough to prove fraud. So, there's lots of different ways to prove medical necessity for the government. One is calling an expert, of course. Two is calling the treating physician to somehow say that they were not issuing valid prescriptions, but just relying on the patients. And in this case, by the way, the patients have said that they all spoke to the doctors, they all told the doctors of their ailments, they all had scars or pain, and that the doctors relied on that initiative. Excuse me, Judge Marcus, but I thought we had one patient who testified she got the scar cream, expensive scar cream prescription, and she did not have a scar. So, there was one patient who said, well, I think you're referring to Nicole Powell, who said that on direct, but then she sent an email to Mr. Groh, and that was brought out where she wrote to Mr. Groh, for your information, I am loving the scar cream. I had a burn scar on my chest, and it is almost gone after a month of use. That's at page 123 of docket entry 231. So, even if they could somehow prove that that prescription... That only proves it was up to the jury to find either way. Either she was telling the truth in direct or telling the truth in cross. No, I don't think so, Your Honor, because I think they had to show two things there. One, that she was given a prescription for some non-medical purpose. So, let's assume that the jury could disbelieve on that case that there was some legitimate reason. They also have to prove that Groh knew that the doctor issued the prescription for non-medical purpose, and there's no evidence of that. So, unless they had somebody who said, some doctor, treating physician, or someone else who came up and said, look, we were prescribing it for outside of the course of medical purposes, they fail. And that's on all fours with the Medina case. And, in fact, Medina had sort of, I'll say, worse facts than the Groh case. In Medina, there were oxygen concentrators that were prescribed, but not used. And the government said, therefore, they weren't medically necessary, and the court rejected it. This court rejected it and said, there's no evidence that the oxygen wasn't legitimately prescribed. Let me ask you a follow-up question, counsel. Wasn't there testimony from Ginger Lay, Groh's co-defendant, that the TRICARE beneficiaries they targeted did not need these medications? No, Your Honor. She did not say that. In fact, she said that they were looking for TRICARE beneficiaries that needed it, that could fill out the intake form and said that there was a scar or pain. And that's why those intake forms and those patients were sent to the doctors. Groh, there was no evidence that they were targeting people who didn't need it. That wouldn't make sense for the operation. And that's a perfect example is the substantive count in Cal 5, Lance von Lechtemann. He testified he had a knee injury. He was going to physical therapy. He was taking a painkiller. They tried to equate need with life or death, and that's not what medical necessity means. And that's why both of the fraud counts failed. I'd like to move quickly to the sentencing on Count 1, which was also invalid because there was no specific verdict for him and because the trial court did not make any findings at sentencing. As we know, Count 1 charged two objects, healthcare fraud, which is a 10-year count, and wire fraud, which is a 20-year count. Both sides requested a verdict form where the jury would have had to specify which object it was unanimous on, but the trial court didn't give it. And the trial court did not make any findings at sentencing as he was required to. Mr. Marcus, you concede that the jury wasn't required to actually find that, that the court could have done it at sentencing but failed to do so, correct? Correct, Judge Carnes. Under this court's cases, McKinley, Bradley, Vallejo, for sentencing purposes, the judge had to find beyond a reasonable doubt which object in this case was found. And he had to find it beyond a reasonable doubt as 1B1.204 and those cases say. And this issue was preserved in the sentencing pleadings at docket entries 185 and 193. Even the government told the judge that he had to make such findings and the judge didn't make it. So I think that's an easy one on the sentencing that it needs to be remanded if the court finds the evidence sufficient. Next, I'd like to talk about the interference with the jury deliberations. So here the jury was deliberating from Wednesday on and on Friday afternoon, unprompted, the judge tells them that they could reach a partial verdict and there was another jury starting on Monday morning. So we'd have to find some other place for them. There was absolutely no reason to tell the jury such things. The only reason to tell them that was to pressure them to come to a verdict, to pressure them to hurry up. And this was especially prejudicial in this case where the defense closed that the jury should not compromise. The jurors never said they were at an impasse. They never said they were having difficulty. And the judge did not give them those protections that we see in other instructions like don't give up your honestly held beliefs. You still have to find it beyond a reasonable doubt. And he did this over objection. And so your difficulty there, Mr. Marcus, is that he repeatedly said they could take whatever time they need. I know, Your Honor, he did. He did say that. You're right. But the jury is understands what was going on there. And there's lots of cases that say, you know, we shouldn't assume the jury is not smart. They understood that he was giving them that information. We also have to presume, unless there's strong evidence to the contrary, that the jury follows this instructions. And part of those instructions were that you find leaving out the problematic parts. You take as long as you want or as little as you want. You decide how long you stay. This doesn't mean that you have to reach a decision by five or any account or all the accounts. You decide, et cetera, et cetera. He lauded those paragraphs with assurances to the jury that they weren't being rushed and they could take all the time they wanted. Judge, I see my time's about to end. And I guess I would end with a quote that directly addresses that point from United States v. Moore. We cited in our briefs, it's the Seventh Circuit case. And the quote is, absent the jury's declaration that it is deadlocked as to one or more charges, giving the jury a supplemental instruction that it can return a partial verdict might be construed by the jury as a hint from the court that it is taking too long to render a verdict. And so my time's up. I would ask the court to look at that quote in that case. Telling them that on a Friday afternoon and saying another jury's coming in on Monday was interfering with the jury unduly. And so I think that gets us a new trial. And I'd like to save that answer for my time. Counsel, wasn't the object here, or at least part of the judge's purpose here, that he wanted to tell them about scheduling? Because though they had worked till 6.30 some days, today we're going to work only until 5.00. That doesn't mean you have to reach a decision by 5.00. He just was telling the jury at 3.35 that at 5.00 they were going to break, which was different from what they had usually been doing. So he was just really letting them know on a Friday afternoon that they were going to go home at 5.00. Wasn't that part of his object? So, Judge, if that's all that the district court said, of course, there'd be no problem. If he brought them out at 3.30 and said, look, you guys are going home at 5.00 today instead of 6.30. But he did a lot more than that. He said, if you want to reach a partial verdict, you can, which violated Rule 31b-2. He also said, you know, there's going to be a separate jury coming in on Monday, so we're going to have to figure out how to deal with this other jury. The message was clear, not just that we're ending at 5.00 today, but hurry up, please. It's Friday afternoon and we have other things going on. And when did they return with a partial verdict, Mr. Marcus? They returned not with a partial verdict, but they returned with... I'm sorry. I'm sorry. I should have been more straightforward. That's my point. There's a danger they might feel pressured to come in with a partial verdict. They didn't come in with a partial verdict, nor did they come in with a verdict Friday afternoon. They came in with a verdict after several hours of deliberation on Monday. So, Judge Carnes, I would respond to that. The harm of giving this partial verdict instruction is not that you might get a partial verdict from the jury. The harm is that it intrudes on the jury's deliberative process in ways that we cannot know. The jury was deliberating dutifully for days. And if we cannot know it, you have failed to show that there was error that prejudiced your client. Judge, I guess the point of these cases is that when a judge interferes into the jury's deliberative process by saying things like this, the court can assume prejudice because you can't know. You're not in the jury room. They came back the very next day when they were told you can't have lunch. Has any court ever assumed prejudice and reversed a verdict because the judge gave a partial verdict instruction where there was no partial verdict? Yes, Your Honor. The cases that we cite discuss just that situation. Moore from the Seventh Circuit. There's another case called Edison. No, no, no. Moore didn't reverse, did he? I didn't think they did. Am I wrong? Moore issued a new trial, if I'm not mistaken. I'll pull it out right now during the government's time and address that. You see, but it seems to me, counsel, that the central problem you have with the argument is after sending them back to deliberate Friday afternoon at 3.37 p.m., he kept them and they dismissed them at 6.08 p.m. Friday afternoon for a whole weekend, brought them back Monday morning at 8.30 a.m., and they returned a verdict more than four hours later at 12.48 p.m. It doesn't sound like they felt coerced. That's the problem that I'm having. I disagree because this was a huge indictment, a very complex case of 50-plus counts. So if they had, again, we don't know, but if they were just deliberating and not reached any verdicts at 3.30 on that Friday afternoon, coming back a few hours later the very next jury deliberation day seems pretty short in the scheme of things when they had not indicated an impasse. And so I think we can take into account, I don't think it's fair to say the weekend because they weren't deliberating over the weekend, but the very next business day they're brought in and told no lunch today, we'll go to one o'clock straight through, and they dutifully reached their verdict that day. Well, it's every jury's duty to reach a verdict if they can, but we're yaya-ing now instead of arguing or listening to argument. So we'll take that issue as you presented it, and I took you over a good bit, so we'll give you your full five-minute-long reply, Mr. Moss. Thank you. Thank you. All right. Next attorney up is Mr. Colan for the United States. Thank you. Good morning, Chief Judge Collins. May it please the courts, this is Jonathan Colan on behalf of the government. I quickly just want to quote a few words of Monty Grove directly, which I think show, unlike the Medina case, both his fraudulent intent and that these were specifically not legitimately prescribed medications. Grove's own e-mails, this is in the GX85 and others I can discuss, show that he specifically had the doctor's prescriptions sent to him first, quote, in his words, quote, to make sure they were done correctly. That's at 232-72, and both the e-mails and testimony show that his intent and action was to get prescriptions fixed is the word he used. Specifically to get more reimbursements. If he didn't like what they prescribed, he worked at it to make sure that they did. I'm sorry. Counsel, how does that show they weren't medically necessary? He could be concerned about getting the prescription fixed or as many refills as possible, even if they were medically necessary. Because his defense is that he's relying on the good faith and judgment of the doctors, and that's what the Medina case discusses. But this shows that he was the one controlling the prescriptions. Dr. Bansal testified that, you know, how he would legitimately prescribe that you don't prescribe refills, you start out with lower medications and lower doses to see how it works. Counsel, I thought what Dr. Bansal said is that's his practice. And I thought he also testified, either direct or on cross, that he only prescribed medications when he thought they were necessary. Am I wrong about that? That's when he testified. And this record shows, and this is the docket entry 231207 in Government Exhibit 49, that when Dr. Bansal tried to prescribe something different, Groh complained about it repeatedly, worked to get it changed, so that Bansal's original prescription of scar cream 03, which is the lower medication, was changed to SC01 before Groh would fax it back to the pharmacy. Oh, changed, changed. Counsel. Changed by whom? It's unclear, but the point is that Groh would give pre-printed prescriptions to the doctors. This is a prescription mill, which in the Ignaziak case that the Groh-Sisonis reply brief is evidence that these are not legitimately prescribed medications, unlike Medina. Think of it like a pill mill case where every patient who comes in gets the same prescription and this is of course repeatedly shown in pill mill cases, but the fact that the doctors at a pill mill might issue the prescriptions when every patient gets the same prescription, and that shows what Groh wanted. Groh said that every patient could get this. Groh may have wanted everybody in the county to get a prescription through him. That doesn't mean that he knew that some of the prescriptions that were obtained by these patients from doctors were not medically necessary. Well, for example, when Ginger Lay asked him what if a patient doesn't have a scar, his words are everybody has a scar. That's showing his intent. He knows everybody doesn't have a scar. There's nothing medically necessary about everybody. Counsel, counsel, I'm sorry, but can you give us one specific patient for which there is evidence that Groh did not know that a prescription given to that patient was medically necessary? No, but I can tell you, no, but I can tell you that he, I can again cite you evidence and testimony that he was instructing the people, his patients and his recruiters and Lay, and complaining to the doctors that it did not matter what the patients wanted. He was telling them make sure everybody gets it. When you say everybody, there's medicine that is everybody. When he is telling them it doesn't, you know, everybody gets it. Always give them this. Always preprint this. What's your best evidence that he encouraged people working for him to be sure that every single person got everything? He repeatedly tells Ginger Lay everyone has scars. Quote, always choose a scar cream. That's a docket entry 229, 259. There were other cases where he repeatedly tells to her, always make sure it's prescribed. There's the email chain in Government Exhibit 85 where he discusses with PCA why he has the doctors send him, not the doctors deciding, but the doctors send to him, a non-medical professional, the prescription so that he can check it first. So the quote in his words, make sure they were done correctly. And when they weren't done in Government Exhibit 49, he goes back and forth with them and complains to the telemedicine company. Who is he to complain to a telemedicine company that the doctors aren't prescribing what he wants? That's not medical necessity. The government's position on medical necessity never changed. It was consistent at trial and in appeal that medical necessity was entirely irrelevant to his intent. He admitted that 97% of the time he got what he wanted from the doctors. His intent was that everyone gets the prescription. And that shows it's not medical necessity because nothing in medicine is everybody. It always has to be per patient. I'll give you another patient that wasn't discussed in the initial part of the argument. Josie Brundage, and this is a docket entry 232, pages 12 to 13. She testified she never spoke to a doctor, did not have scars, was told she would receive money for ordering the prescriptions, ordered them and then got paid. Where's your evidence that Groh knew that? Groh doesn't know about Brundage, but Groh recruited Sven Berg. Groh, this is a docket entry 232, pages 15 to 28. Sven Berg was the one who then in turn recruits Brundage. Remember, this is a conspiracy. He's working with other people, letting them know how it works, and they then go off and recruit others. So Groh recruits Sven Berg and told him, this is Groh, you want auto refills so you could get more money. Groh told Powell, what Powell was asked, Nicole Powell was asked, this is a docket entry 231, page 107, that when Groh signed her up, she was asked, did he ask about your medical needs? And she said no. It was a quote, it was a way to make money, and I needed to order the scar cream and the pain cream in order to do the business. She didn't know. She didn't need the prescriptions. Everyone understood what this is about, the substantive healthcare fraud, which is Blair von Lettman, who was one of Ginger Lay's survey patients, and Ginger Lay testified that she discussed the survey patients in the program and the paying the patients with Groh, and they were entitled to believe her. And yes, Lay did testify, I believe this is page 226 of her testimony, she did testify that her patients did not need the drugs. The jury's entitled to believe that this was part of the conspiracy. But anyway, she recruits Blair von Lettman, who testified he didn't need the pain medication, and he understood what this whole scheme was about. Quote, it was an easy way to make a little bit of extra money, and if it worked, it worked. If it didn't, it didn't. That's a docket entry 231, 107. This is a conspiracy, where he's letting the people know how this worked, and they understood quite well how it worked. And he kept testifying, it was a way to make money. It's not about their needs, and they all understood that. And that was part of his conspiracy and his intent, that medical necessity was entirely irrelevant to everybody getting the medication. And that's why he can't rely on the doctor's prescriptions any more than we can in a pill mill case, where we show that the process, and this even is in his own case, Ignatius, where a pill mill or a prescription mill shows that that's not medical necessity. So let me quickly turn to two of the other issues before my time expires, regarding the wire fraud object. First of all, Gros got the conspiracy object instruction that he requested, which also did not have the wire fraud instruction. But even under plain error, in this court's Gros-Martin case, or even under Nader, where required elements are missing, there is no error in sentencing a defendant based on missing elements or facts that are inherently subsumed in the jury's findings.  Wait, wait, wait. We don't know what's inherently assumed or consumed in the jury's findings. We know that the jury found either health care fraud or wire fraud, or both, but we don't know which of those three alternatives it was. And you make an argument, and I understand it, that that wasn't plain error, and therefore he's not entitled to a new trial with new instructions of the jury. As I understand Mr. Marcus's opening here today, it's more narrow point than that, which is, okay, fine, then the judge has to find it at sentencing to know which path to proceed under at the sentencing, at the start, on the basic offense level. And the judge didn't do that, and we objected to it, so there was no forfeiture of the objection there. The judge hasn't found that, and it needs to be remanded for the judge to find it. What say you? Well, first I want to point to what the judge did say about it, and he could have been clearer, but at docket entry 240, which is the sentencing hearing, at page 26, the judge notes that count one is conspiracy to commit health care fraud and wire fraud on everything. So to the extent he made a finding, that and there was another statement similar, but that I'll point you to in the record. Yeah, but that's just what count one was. The jury didn't find, choose between the two, and the jury didn't find that they were both present. That's the problem. Get past the jury instruction. We're at sentencing. I understand Mr. Marcus to say, we pointed out there's been no finding which object. It's a dual object conspiracy, so you need to find it. We object to you sentencing him because it was health care fraud. It may have been wire fraud. You've got to find that, and the judge didn't do it. To the extent that that statement isn't sufficient, and that then there was no other additional finding. That is correct, Your Honor. But our view is that under Nader, which is a dude under the harmless error standard, or Cromartie under the plain error standard, the jury did find that the fraud occurred. We know that because we reject counsel. Mr. Cohen, this is Judge Marcus. Didn't we make clear in Allen that harmless error review is foreclosed under circumstances like this? I think the Nader case would allow it, but even under Nader and both Cromartie, which are both valid precedent of this court, and if I can just complete the thought, if you think it doesn't count. I'm asking you about the Allen case. I'm asking about the Allen case in particular. Didn't we foreclose... I'm sorry, Judge. In United States v. Allen, we held that when the object and the dual object conspiracy carry different maximum penalties, a special verdict form and a finding by the jury with regard to the object was not required, and we went on to reject the idea that harmless error review would apply or vitiate the problem. Do I have that right? I'm sorry, Your Honor. I don't have that in front of me. I can follow up with the court if you would like, but in that case, I would also just respond with the invited error argument in that Mr. Groh's own proposed instructions did not include a separate instruction on wire fraud. Mr. Marcus, Mr. Marcus, you keep going back to the jury instruction. We are at the Senate stage. We're past the jury instruction. We're not talking about reversing the conviction because there was no finding by the jury of which object applied of the conspiracy. What we're talking about is when you get to sentencing and the defense says, I object to you sentencing this person as though he was guilty of wire fraud because there's been no finding by the jury or by you beyond a reasonable doubt that he was guilty of the wire fraud object of the conspiracy. We're past. They didn't invite error at sentencing. An invited error would have been at the guilt stage. We're past that. Please address the Senate stage error. Yes, Your Honor. If the judge's statement that I cited at page 26 is an insufficient finding, then it would be remanded for him to make a more sufficient finding as to that wire fraud was consumed in the healthcare fraud. If I can quickly just address the jury deliberation issue before my time expires, there is nothing, as the defense suggests, in the judge's instructions, discussion with the lawyers that expresses any kind of surprise or annoyance. The lunch was not withheld. It's similar to the Brewster case where a judge kind of punished the jury by withdrawing things from them. As the court has pointed out, this is simply a scheduling discussion. And when the court says we're going to break at 1 o'clock today and therefore we're not going to take a lunch break, that is not withholding lunch or depriving them of lunch. This is simply the court saying, today we're going to end at 5. You can report whatever you have. We're going to come back on Monday. And on Monday he says we're going to break today at 1. Let me ask you a question. Counsel, let me ask you a question about that. Why would the judge, when he's telling them on a Friday afternoon that they were going to break at 5 rather than the normal custom of going at least until 6.30, and he tells them they don't have to rush and they can take all the time they need, he also tells the jury that they could reach a partial verdict. What possible reason would there be in the area of scheduling for him to have told the jury they could reach a partial verdict? Other than... Let me finish. Other than to kind of prod them and push them along. Time is elapsed. Your Honor, I'm... You think that's a great question. Please. Thank you. Yes. I can't know what was in his mind. I can speculate that he was simply saying if you want to report something now, great, but we'll come back on Monday, keep going. As you have noted, he kept repeatedly telling them you can take as much time as you like and you're in charge to do what you want. He was... The reason I ask the question, the reason I ask it is at no point did the jury say we were deadlocked or we got a jury verdict on some but not other counts. What do we do? Just out of the clear blue, when he's saying I'm going to let you go at five, he pops in the suggestion they could reach a partial verdict. If that wasn't designed to prod them along, then I'm hard-pressed to know what the object of that statement would have been. No one's in his mind. We can know that the judge explained himself to the lawyers saying, look, this is not an Allen charge. He didn't view this as an impasse. He tells them I'm not giving an Allen charge. So there's no reason to give the Allen instructions about, you know, being flexibility of mind and all that. His own discussion with the lawyers shows that in his mind, this was a matter of fact scheduling issue. So to the extent we can know what his intent was or what was going through his mind, the context of his discussion with the lawyers shows that there was no annoyance or surprise or intent to pressure or prod. He viewed this as a very matter of fact scheduling issue. So that's what he was going for. And the jury, as you say, took it plainly that they were allowed to keep going because that's what they did. They were allowed to go on Monday. And that context shows no evidence of them being pressured or prodded. The evidence here shows that Gros clearly manipulated this scheme and did not rely on the doctors. And the jury's findings reflect that they rejected his testimony and his conviction and sentence should be affirmed. Thank you. Thank you, counsel. Mr. Marcus, five minutes. Thank you, Your Honor. I'll first address the fraud counts, counts one and count five. This is where the prosecutor has now said this was an easy way for Gros to make money or for the patients to make money. But again, that's exactly the language that Medina says is not enough. So the fact that Gros always wanted the doctors to prescribe these medications, that may be true. I mean, all marketers and salespeople always want to sell, sure. But in every single case, it had to go through the doctor. So in every single case, a doctor had to approve of the prescription and the doctor was free to change it, alter it or not give it. In fact, the only doctor that they called, Dr. Bonsal, said that he frequently changed it and wouldn't approve what the marketer sent him. And he was the best evidence for the defense. And that was the only doctor that testified. I'll also underscore that no prescription was altered or changed in any way when my friend says that Gros would try to fix forms. Certainly that's true if something was filled out incorrectly. But after a doctor signed the prescription, there's no evidence. And in fact, Gros never altered or changed or forged a doctor's signature. And that's critical in this case because in a lot of the other cases before this court, we see forged prescriptions. We see fake doctors or fake patients or fake medicine. None of that happens here. We have real doctors issuing real prescriptions to real patients who got their medicine. The prosecutor also points out that in his argument just now that the prescriptions were pre-filled. And that somehow makes them invalid. I would point out that that absolutely is not true. In the same way that lawyers propose orders to judges, that does not mean that the lawyers control the judges in some way. The judges are free to either sign the proposed order, throw it in the garbage, alter it, whatever they want. Of course, every lawyer's intent when they send the proposed order to the judge is that the judge signs it as is. But that doesn't mean that the lawyer has committed some fraud or that the lawyer is controlling the judge. And in fact, in this case, all of the evidence shows that the doctors didn't always approve what was sent. Even Ginger Lay, the government's star witness, said that. And that's why over and over and over again at the trial, the prosecutor said medical necessity was supposed to call experts talking about these creams and the patient's charts. And the prosecutor said there's no need. And the judge agreed with that, the district judge, because medical necessity simply wasn't an issue. The one patient out of the hundreds that the prosecutor can point to that testified that she didn't speak to a doctor, Josie Brunbridge, I think Judge Carnes correctly pointed out, there's no evidence that Gros knew anything about that. I'm Josie Brunbridge. The one substantive count, of course, Blair von Lechtemann. There's no evidence that Gros knew anything about him, even if the prescription wasn't valid. But in his particular case, the prescription was valid. He was in pain and he had scars and a doctor prescribed it. I'll turn quickly to the point about sentencing the object. The prosecutor cites those two cases, Cromartie and Nieder, but those are not multi-object conspiracy counts. In every case that we cited, including the one that Judge Marcus raised, those are multi-object conspiracy counts. There have to be specific findings. It was preserved and there were no findings. Finally, the instruction issue. This was not just the judge telling the jury about scheduling that will only go to five o'clock. He was very, very specific about the partial verdict instruction. And I'd like to point the court to Rule 31b-2, which says that a jury can reach a partial verdict only if they've indicated that they can't reach a full verdict. And they have not. They did not do so in this case. That's why the district judge was in error to interfere. This is actually... Mr. Marcus, let me ask you this. I'm having... The core difficulty I have with your argument about the jury instruction is it didn't result in a partial verdict. Suppose the judge had told them, you know, it's totally up to you. You're the judge of the fact, but I'll tell you something. He's guilty as Hades on count 12. Just take it from me. And the jury goes back and deliberates and comes in and doesn't convict him on count 12 but convicts him on some other counts. Now, you would be up here arguing that we had to reverse the other counts because the judge made an error in instructing him about that one. The judge made an error in instructing him about partial verdicts, and they didn't render a partial verdict. The necessary premise of your position, as I understand it, is that every time a judge tells a jury that they can render a partial verdict, we have to assume that that tainted the non-partial verdicts and that doesn't make any sense to me. So, Judge Carnes, let me address that because I'm not asking for a bright line rule. Go ahead, Nancy. Thank you. I'm not asking for a bright line rule that any time a judge gives this instruction, it's reversible error per se. What I'm saying is in the totality of the circumstances here, Friday afternoon, 3.30, the jury had issued no notes. They're told not only that they could issue partial verdicts, but that there was going to be a problem on Monday with another jury coming in. And then on Monday morning, they're told they're not going to get lunch and that they're only going to go until 1 o'clock. And then, lo and behold, at 12.48, they come with verdicts. Taking everything, the totality of the circumstances in this case together, I think it shows, one, that the instruction was improper, two, that it rushed, the message was to rush the jury and three, they were, in fact, prodded by that 1 o'clock deadline with no lunch because they came in at 12.48. So that's my argument. I thought we were arguing about the partial verdict issue. I thought that's what you objected to, not to the fact that he told them they would adjourn at 1 o'clock. No, it's all together, Your Honor. I agree that the partial verdict portion was, I think, the most inflammatory. But when there's an objection, and you have to look at the totality of circumstances on appeal, I think we can take everything into account with that instruction of what was going on. But just so I'm clear about my reading of the record, you did not object to him saying anything about we'll adjourn at 1 o'clock and you can go find lunch on your own. You didn't discuss that with him at the trial, you being the defendant. Correct. That's correct, Your Honor. That's correct. We've got your argument on that. It stays under submission. Thank you. You're welcome. Thank you for your argument.